UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-587-H

FAY AUTRY                                                                                          PLAINTIFF

V.

STEPHEN M. JOHNSON, in his individual and
official capacity as director of the Kentucky Office
for the Blind; and the KENTUCKY OFFICE FOR
THE BLIND                                                                                      DEFENDANTS

**MEMORANDUM OPINION**

Fay Autry ("Plaintiff") seeks judicial review of a decision by a federal arbitration panel

denying her claim that Stephen Johnson ("Defendant"), Executive Director for the Kentucky

Office for the Blind,[1] failed to follow the requisite criteria in hiring for a licensed blind vendor

position at Fort Knox Army Base.  Plaintiff also claims, pursuant to 42 U.S.C. §1983, that

Defendant violated her First Amendment rights by denying her the position based on statements

she made in a newspaper article.  Defendants have moved for partial summary judgment as to the

First Amendment claim.  After thorough consideration, the Court concludes that Plaintiff's First

Amendment claim must be dismissed.

I.

Plaintiff is a licensed blind vendor under state and federal programs[2] that give priority to

---

[1]  Known as the Kentucky Department for the Blind at the time of the underlying events.

[2] 20 U.S.C. 107, *et seq*. (The Randolph Sheppard Act); KRS 163.470.

vision-impaired individuals in operating vending facilities on government property.  For several years Plaintiff operated a vending stand in the Hall of Justice in Louisville.  In 1998, a planning committee of local officials considered replacing that vending stand with vending machines.  More than two thousand people signed a petition in support of keeping the stand.

The Louisville *Courier-Journal* covered the proposed elimination of the vending stand in an article on May 2, 1998.  That article features a large photograph of Plaintiff at the vending stand, and quotes Plaintiff twice.  In the first quotation she states, "I'm devastated.  I can't believe they don't have room for a little snack bar."  In the second, responding to a question about what she will do if her stand does not survive, she states, "I don't know what I'd do . . . This is the only thing I've ever done."  The article also notes that Plaintiff would manage the vending machines if her stand were eliminated.  Ultimately, local officials decided not to eliminate the stand.  Plaintiff says she knew at the time she made the comments that the elimination of the stand would not leave her unemployed.  She says the article mischaracterized her statements.

In early 1999, Defendants solicited applications for a newly created blind vendor position to operate food concessions at Fort Knox.  Twenty-five blind licensees, including Plaintiff, applied for the position.  Aided by an advisory committee, Defendant Johnson had ultimate hiring authority for the position.  The list was first reduced to applicants with thirty or more years of experience, which included Plaintiff.  The advisory committee assigned the remaining applicants a point total.  Two applicants received a higher total than Plaintiff.  One of those applicants was chosen for the position.  Plaintiff had lost points in the areas of public relations skills and attitude.  Defendant says neither he nor the advisory committee relied on Plaintiff's

2

comments in the newspaper article in denying her the position.  However, he cites those comments as illustrative of a general lack of tact and discretion she had displayed for years.

II.

Defendants argue that the Eleventh Amendment bars Plaintiff's claims against the Kentucky Office for the Blind, and against Stephen Johnson in his official capacity.

The text of the Eleventh Amendment bars "any suit in law or equity, commenced or prosecuted against one of the United States."  However, the doctrine of *Ex parte Young* supplies an exception to this rule for claims for injunctive relief against individual state officials in their official capacities.  *Carten v. Kent State University*, 282 F.3d 391, 395 (6th Cir. 2002) (citing *Ex parte Young*, 209 U.S. 123 (1908)).  The exception applies where "[the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645 (2002) (*quoting Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).

Here, Plaintiff seeks to establish that Defendants violated her First Amendment rights by declining to hire her for a vendor position in 1999.  If she had requested money damages for that violation, her claims would clearly be barred as seeking purely retrospective relief for a past violation of the law.  Instead, she has styled her claim as one for prospective relief, requesting an injunction forcing Defendants to divide the $150,000 per year Fort Knox position into two $75,000 per year positions and to place her in one of those positions, and requesting further that Defendants be enjoined from violating her First Amendment rights.

These prospective requests, however, would not appear to end any ongoing violation of Plaintiff's rights.  That is, Plaintiff has alleged a discrete act of First Amendment retaliation

3

occurring in 1999.  She does not describe how this violation or any other extends into the present.  Plaintiff's claim, therefore, does not fit the *Young* exception.  Although not raised by Plaintiff, the Court has considered whether this case bears comparing to § 1983 claims for reinstatement by former government employees terminated for exercising their constitutional rights.  Like the present case, those cases do not appear to allege any ongoing violation of federal law.  It seems the alleged violation occurred distinctly in the past when the employee was terminated.  However, courts have held that the state official commits an ongoing violation of federal law so long as he keeps the terminated employee from a position to which she is otherwise entitled.  *See Carten*, 282 F.3d at 395.  One might argue that the logic of those cases applies here.  That is, do Defendants likewise commit an ongoing violation of law by keeping Plaintiff from the vendor position for which she applied?

To reach such a holding, however, would constitute a further extension of the *Young* doctrine.  That is, denying an individual new employment looks less like the type of ongoing violation contemplated by the *Young* doctrine than does dismissing an individual from a job she actually held.  The Court declines to extend the *Young* doctrine to these circumstances.  This conclusion comports with the Supreme Court's careful development of the *Young* doctrine, in which the Court has hewn closely to an emphasis on remedying only present, ongoing violations of federal law:

> *Young*'s applicability has been tailored to conform as precisely as possible to those specific situations in which it is "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'"  *Pennhurst, supra*, at 105, 104 S.Ct., at 910 (quoting *Young, supra*, 209 U.S., at 160, 28 S.Ct., at 454).  Consequently, Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the

4

> state official directly ends the violation of federal law as opposed to cases in
> which that relief is intended indirectly to encourage compliance with federal law
> through deterrence or directly to meet third-party interests such as compensation.
> As we have noted: "Remedies designed to end a continuing violation of federal
> law are necessary to vindicate the federal interest in assuring the supremacy of
> that law. But compensatory or deterrence interests are insufficient to overcome
> the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 U.S. 64, 68,
> 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) (citation omitted).

*Papasan v. Allain*, 478 U.S. 265, 277-278 (1986).  Since Plaintiff has failed to allege any

ongoing violation of federal law, the Eleventh Amendment bars her claims against the Kentucky

Office for the Blind and Stephen Johnson in his official capacity.  This leaves the First

Amendment claim against Johnson in his individual capacity.[3]

III.

Defendants contend that Plaintiff's First Amendment retaliation claim fails primarily

because her comments to the newspaper did not amount to constitutionally protected speech.[4]

To establish a prima facie case of First Amendment retaliation, Plaintiff must show

> (1) that [s]he was engaged in a constitutionally protected activity; (2) that the
> defendant[s'] adverse action caused [her] to suffer an injury that would likely chill
> a person of ordinary firmness from continuing to engage in that activity; and (3)
> that the adverse action was motivated at least in part as a response to the exercise
> of [her] constitutional rights.

*Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 965 (6th Cir. 2002)

---

[3]  The Court notes that this claim does not appear cognizable because Plaintiff has requested forms of relief that Johnson has no ability or authority to provide in his individual, as opposed to his official, capacity – i.e., an injunction placing Plaintiff in the vendor position.  However, Plaintiff has also requested all other relief to which she appears to be entitled, a request which, theoretically, includes some cognizable form of relief.  Thus the Court will proceed to analyze this claim.

[4]  Plaintiff is not a state employee, but a licensee.  For this reason, Plaintiff argues that the lesser First Amendment protection afforded to government employees under the test from *Connick v. Myers*, *infra*, does not apply.  However, the Supreme Court has extended the principles of *Connick* beyond employees to encompass independent contractors as well.  *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 684 (1996).  Additionally, the Fifth Circuit has specifically applied these principles to a licensed blind vendor.  *Copsey v. Swearingen*, 36 F.3d 1336, 1344 (5th Cir. 1994).  The Court will therefore apply these principles to the present case.

(citations and internal quotations omitted).  As to the first element, speech is constitutionally protected when it "addresses a matter of public concern, and the employee's interest in making such statements outweighs the 'interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (citations and internal quotations omitted).  A public concern is one "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).  Matters of public concern about a government employer would include assertions that the entity failed to discharge its governmental duties or committed wrongdoing or a breach of public trust. *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003) (quoting *Connick*, 461 U.S. at 148).  On the other hand, matters ordinary to any employment situation such as internal personnel disputes or complaints about an employer's performance, do not involve public concerns. *Id.*  The Sixth Circuit has framed the critical distinction as whether the plaintiff speaks "as a *citizen* (albeit in the employee role) versus speaking as an employee for *personal interest*." *Id.* at 600 (emphasis in original).

The leading Supreme Court case concerning protected employee speech is *Connick v. Myers*, 461 U.S. 138 (1983).  There, a prosecutor, disappointed over her pending transfer to a different division, circulated a questionnaire to her fellow prosecutors soliciting their views on the following topics: "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141.  She was fired in part for circulating the questionnaire, which her supervisor considered an act of insubordination.  The Court held that only the question regarding political campaigns constituted protected speech: "the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community

6

upon which it is essential that public employees be able to speak out freely." *Id.* at 149.  The

Court viewed the other questions as mere extensions of her dispute over being transferred.

"Indeed, the questionnaire, if released to the public, would convey no information at all other

than the fact that a single employee is upset with the status quo." *Id.* at 148.

A.

The Sixth Circuit has applied the principles from *Connick* in many cases.  However, none

involve facts that provide direct guidance to our facts.  Nevertheless, it is instructive to survey

the landscape of similar First Amendment cases.  These cases reinforce that the issue of whether

speech is of public concern tends to be highly fact-specific.  *Farhat v. Jopke*, 370 F.3d 580, 590

(6th Cir. 2004).

In *Rahn v. Drake Center, Inc.*, the plaintiff was a nurse at a new privately run hospital

that received significant public assistance in the form of a large tax levy.  31 F.3d 407, 412 (6th

Cir. 1994).  Shortly after the hospital's formation Plaintiff delivered a press release on behalf of

a committee of concerned employees, patients and citizens, criticizing the new hospital

management and setting forth specific areas of concern, including unfavorable employee

policies, failure to publish goals, failure to declare a hospital philosophy, and decreases in

employee benefits.  The release noted that bad employee policies could lead to absenteeism

which would in turn hurt patient care.  The release also contained several references to the tax

levy and concluded by calling for an open public meeting to discuss the issues raised.  Plaintiff

was fired a few days later for absenteeism, but claimed she was fired for exercising her First

Amendment rights in delivering the press release.  Plaintiff argued the press release constituted

protected speech because it discussed a project funded with public money and voiced concern for

7

patient rights.  In a split decision, the Sixth Circuit affirmed the dismissal.  The Court applied an earlier rule stating that the mere fact that speech addresses a matter related to public money does not make the speech protected.  Additionally, the Court noted that the ostensible concern for patient rights was really a concern for employee satisfaction.  Further, the Court noted that the public nature of the pronouncements – a press release – did not help Plaintiff's argument since Plaintiff, rather than a news outlet, initiated the pronouncement.  Although touted as public speech, the release was "most accurately characterized as an employee grievance concerning internal office policy."  *Id.* at 414.

In *Brandenburg v. Housing Authority of Irvine*, the Plaintiff was Executive Director of the Housing Authority of Irvine, Kentucky.  253 F.3d 891 (6th Cir. 2001).  Through a series of events Plaintiff's relationship with the rest of the board had deteriorated.  Primarily, Plaintiff had developed a personal conflict with one board member who Plaintiff believed had a conflict of interest.  Additionally, Plaintiff disagreed with ongoing projects to demolish a particular development and to move the Housing Authority's management offices.  When interviewed for a newspaper article about the demolition project, Plaintiff criticized the project, referred to the move of the offices as a waste of taxpayer money, and discussed the alleged conflict of interest presented by the other board member.  As a result of her comments, the board decreased Plaintiff's responsibilities.  The board felt Plaintiff was hostile to the Board, failed to support its initiatives, and attempted to publicly damage its reputation.  The Sixth Circuit said that these circumstances presented a close question as to whether Plaintiff's comments constituted speech of public concern.  On one hand, the Court noted, the speech did touch upon whether the board was acting in the community's best interest.  On the other hand, the speech resembled personal

8

employee grievances motivated by self-interest and dissatisfaction with the board as an employer. Ultimately, the Court declined to decide whether the comments constituted public speech, because Plaintiff's claim failed in other respects.

In *Banks v. Wolfe County Bd. of Educ.*, Plaintiff was employed as a parent liaison at an elementary school. 330 F.3d 888 (6th Cir. 2003). She applied for a teaching position but was passed over by the school council in favor of another applicant. She then began questioning the hiring policies and procedures of the council, first in her case, then in others. She spoke to members of the council regarding procedures used in her case and submitted an open records request for information on hiring policies as well as her personnel information. She made a formal complaint to a state agency alleging failure to follow procedures in her case and in three other cases. She made a second formal complaint alleging twenty-eight instances of wrongdoing, such as the hiring of uncertified teachers, the failure to post vacancies, the use of favoritism and nepotism in hiring, and various misuses of the budget. As a result of these actions, the council terminated her. The district court dismissed Plaintiff's First Amendment retaliation claim, holding that Plaintiff had not engaged in public speech because she acted out of personal motives. The Sixth Circuit reversed, holding that the District Court afforded too much emphasis to the speaker's motives. The content of the speech, rather than the underlying motive for it, should drive the inquiry. The court said that although Plaintiff had engaged in mixed speech consisting largely of personal grievances, the speech was constitutionally protected because some of it touched on matters of public concern.

Finally, in *Farhat v. Jopke*, Plaintiff was a school custodian with a long and colorful history of disciplinary problems. 370 F.3d 580 (6th Cir. 2004). After being suspended, Plaintiff

9

sent two letters, one to the school superintendent and another to his union president.  Consistent with Plaintiff's previous behavior, the letters contained numerous angry and insulting remarks about many people in the school system and the union.  The letter to the union also alleged corruption within the union, unwarranted preferential treatment, denial of members' rights and benefits, and a hostile environment.  The letters did not offer any examples of these complaints other than Plaintiff's own plight.  Plaintiff was terminated a few months later and claimed violation of his First Amendment rights for expressing his views.  The Court thoroughly surveyed its case law on First Amendment retaliation, particularly in cases of mixed public and private speech.  The Court stated that in such cases it had repeatedly applied what it now called a "focus test," in which it sought the overall focus, purpose, or point of the speech at issue.  *Id.* at 592.  Further, "[a]s a corollary to this 'focus' test, we have held that the proper inquiry is not what might be 'incidentally conveyed' by the speech, and that 'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest."  *Id.* at 592-93 (collecting cases).  In a brief analysis, the Court held that the focus of the letters at issue was the plaintiff's personal "beef" with the union and his deteriorating job situation.  The letters contained only passing or incidental references to public matters such as corruption and collusion.  Therefore, the speech was not protected.

These cases give form and shape to the basic rules on whether speech is constitutionally protected.  *Connick*, and more recently *Banks*, illustrate that mixed public and private speech can be constitutionally protected as long as part of the speech touches on a matter of public concern.  In particular, *Connick* shows that one small but clear reference to a public matter, even if

10

otherwise buried in much unprotected private speech, may invoke the protection of the First

Amendment.  *Rahn*, *Brandenburg*, and *Farhat*, however, illustrate that where speech truly only

advances private concerns, even explicit and repeated references to public matters will not make

that speech constitutionally protected.  Most recently of these, *Farhat* instructs courts to look for

the "focus," "point" or "purpose" of the speech in question.

B.

Here, Plaintiff argues that the proposed elimination of her vendor stand "certainly

involved a public concern if 2,400 people signed a petition asking that a hot food counter remain

in the facility."  However, it is less important that the vending stand issue itself raised a public

concern, but rather whether Plaintiff's *speech* on that topic was of public concern.  Plaintiff does

not explain how the specific substance of her comments constitute a matter of public concern.

Defendant argues that those comments voiced a purely private interest in an arguably public

matter.  The Court agrees.

Plaintiff's comments focus solely on her disbelief and sadness over the prospect of losing

her vending stand.  The only possible exception to this conclusion lies in Plaintiff's comment, "I

can't believe they don't have room for a little snack bar."  One might interpret this comment as

impliedly questioning the justification or necessity for eliminating the vending stand, which

might touch on a public concern.  However, based on a careful reading of the case law, the Court

does not believe that one implied reference to a public matter, couched in comments focused

solely on personal concerns, could qualify as protected speech.  In concluding so, the Court

emphasizes that this determination depends on the precise nature of the speech at issue.  Minor

differences can bring comments within – or take them further outside – the protection of the First

11

Amendment.  Without the implied reference to the public issue here, Plaintiff's comments would fall far outside the First Amendment.  On the other hand, had Plaintiff clearly and unequivocally challenged the decision, as a matter of public policy, to remove the vending stand, her speech may well have been protected.  *See Copsey v. Swearingen*, 36 F.3d 1336, 1345-1346 (5th Cir. 1994) (licensed blind vendor engaged in protected speech by claiming that Louisiana law required state to license particular space in capitol building to blind vendor; vendor expressed these views in a letter to National Federation of the Blind, in televised interview, and in discussions with state representatives).

Having concluded that Plaintiff's comments were not constitutionally protected, the Court need not address the remaining elements of this claim.

## IV.

Even if Plaintiff had a viable First Amendment claim, the statute of limitations probably bars her from asserting it.[5]  The statute of limitations for a section 1983 claim brought in Kentucky is one year.  *Collard v. Kentucky Bd. of Nursing*, 896 F.2d 179, 183 (6th Cir. 1990). The statute begins to run when the plaintiff "knows or has reason to know that the act providing the basis of his or her injury has occurred." *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996) (citing *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir.1991)).

Plaintiff agrees that on April 16, 1999, she learned of Stephen Johnson's reaction to her

---

[5]  Plaintiff argues that Defendants waived the statute of limitations defense by failing to assert it in their original answer.  For support Plaintiff cites Rule 8(c), which requires that a party set forth affirmative defenses in response to a preceding pleading.  However, by filing an amended complaint Plaintiff "wipe[d] away" prior pleadings, giving Defendants the opportunity to raise heretofore unraised affirmative defenses. *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999).  As a general rule, the Sixth Circuit has said that a party does not automatically forfeit an affirmative defense by failing to raise it in its answer. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993).  The party may raise the defense at a later stage so long as it does not offend the principles behind Rule 8(c) – to give the opposing party fair notice of defenses and a chance to rebut them.  *Id.* at 1445.  Defendants have not waived their statute of limitations argument.

comments in the *Courier-Journal* article.  Since his reaction to the article forms the basis for her First Amendment claim, her claim accrued no later than that date.  Thus, the time for filing her 1983 claim has long expired.  Plaintiff argues, however, that the Court should toll the limitations period during the time she pursued administrative remedies through the state grievance process and federal arbitration.  That process did not end until October 10, 2003.  For support she points out that, for prisoners asserting § 1983 claims, the statute of limitations does not begin to run until they have exhausted administrative remedies.  The reason for this is that Congress has expressly required prisoners to exhaust administrative remedies before filing a section 1983 claim.  *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000).  Generally, however, one need not exhaust administrative remedies before filing a § 1983 claim.  *Patsy v. Bd. of Regents*, 457 U.S. 496 (1982).  Because Plaintiff cites no authority suggesting she was required to exhaust administrative remedies before filing her § 1983 claim, the Court would see no reason to toll the limitations period.[6]

---

[6]  Having resolved the foregoing issues the Court need not address Defendants' additional arguments regarding *res judicata* and standing.

13

An order will be entered consistent with this Memorandum Opinion.

cc:     Counsel of Record